IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THOMAS KEARNS | CIVIL ACTION NO.: |
| Plaintiff, | |
| vs. | PLAINTIFF'S COMPLAINT |
| UNION RAILROAD COMPANY | **JURY TRIAL DEMANDED** |
| Defendant. | |

## PLAINTIFF'S COMPLAINT

AND NOW, comes the Plaintiff, Thomas Kearns, by and through his undersigned counsel, D. Aaron Rihn, Esquire, and the law firm of Robert Peirce & Associates, P.C., and claims damages of the Defendant, Union Railroad Company, upon causes of action, the following which are statements:

## NATURE OF ACTION

1. The Plaintiff, Thomas Kearns, brings this action against the Defendant Union Railroad Company for violations of the Federal Rail Safety Act, 49 U.S.C. Section 20109.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction in this case pursuant to the Federal Rail Safety Act, 49 U.S.C. Section 20109 ("FRSA").

3. Venue is proper pursuant to 28 U.S.C. Section 1391(b) in that the defendant resides in this judicial district. Alternatively, venue is proper because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## PARTIES

4. The Plaintiff resides at 104 Evergreen Road, Level Green, Pennsylvania 15085.

5. The Defendant Union Railroad Company (hereinafter "Defendant Railroad") is a corporation organized under the laws of the Commonwealth of Pennsylvania and a common carrier by rail in Pennsylvania and whose corporate office is located at 1200 Penn Avenue, #300, Pittsburgh, Pennsylvania 15222.

## FACTS

6. During all times herein mentioned, the Defendant Railroad was a common carrier of freight for hire and by rail engaged in interstate commerce or in activities having a close or substantial effect on interstate commerce and conducted such activities to substantial extent in Allegheny County.

7. At the time of the Defendant's FRSA violations, the Plaintiff was employed by the Defendant Railroad as a utility man at the U.S. Steel Mill located in Braddock, Pennsylvania and qualified as an employee within the meaning of 49 U.S.C. Section 20109

8. As a utility man, Plaintiff's job duties included working with different crews that came in and out of the mill. He helped to get loaded trains into the plant, and he helped assemble both loaded and unloaded trains leaving the plant.

9. At the time of the incident, Plaintiff made $27.72 per hour and worked approximately 45 hours per week as a utility man. Plaintiff's regular schedule was from 8:00 a.m. to 4:00 p.m. Sunday through Thursday, but he worked a few hours over regularly as needed. Defendant Railroad only required employees to punch out at the time clock, not punch in.

10. On May 24, 2017 at approximately 7:30 a.m., Plaintiff was working as a utility man and observed large amounts of ore on both sides of and inside the gauge, between switch stands,

and some switch points in the Edgar Thompson Port Perry Yard, which made walking conditions hazardous. Plaintiff reported these dangerous conditions to his Supervisor, Jay Browne, via an Employee Safety Issue/Hazard Observation Form, but the issue was not resolved.

11. On June 11, 2017 at approximately 11:45 a.m., Plaintiff was working and again observed large amounts of ore and coke in the switches, the six-foot (the space between the two tracks), and the rail gauges in the Edgar Thompson Port Perry Yard, which made it difficult to throw some switches and walking conditions hazardous. Plaintiff reported these dangerous conditions to his Supervisor, John Novotnik, via an Employee Safety Issue/Hazard Observation Form, but the issue was not resolved.

12. On June 21, 2017 at approximately 9:05 a.m., Plaintiff was working and yet again observed large amounts of ore and coke in the switches, the six-foot (the space between the two tracks), and the rail gauges in the Edgar Thompson Port Perry Yard, which made walking conditions hazardous. Plaintiff reported these dangerous conditions to his Supervisor, Jay Browne, via an Employee Safety Issue/Hazard Observation Form, but the issue was not resolved.

13. On July 6, 2017 at approximately 12:05 p.m., Plaintiff was working and observed large amounts of ore and coke in the switches, the six-foot (the space between the two tracks), and the rail gauges in the Edgar Thompson Port Perry Yard, which made walking conditions hazardous. Plaintiff reported these dangerous conditions to his Supervisor, Jay Browne, via an Employee Safety Issue/Hazard Observation Form, but it was not resolved.

14. On August 7, 2017 at approximately 8:10 a.m., Plaintiff was working and observed large amounts of ore and coke in the switches, the six-foot (the space between the two tracks), and the rail gauges in the Edgar Thompson Port Perry Yard all the way down to the trestle, which made walking conditions hazardous. Plaintiff reported these dangerous conditions to his Supervisor, Jay

Browne, via an Employee Safety Issue/Hazard Observation Form, but the problem was not resolved.

15.  On August 23, 2017 at approximately 3:20 p.m., Plaintiff was working and observed heavy amounts of ore in the switches, the six-foot (the space between the two tracks), and the rail gauges from the Edgar Thompson Edgar Thompson Port Perry Yard all the way down to the trestle, which made walking conditions hazardous. Plaintiff reported these dangerous conditions to his Supervisors, Dan Griffin and Jay Browne, via an Employee Safety Issue/Hazard Observation Form, but the problem was not resolved.

16.  On September 11, 2017 at approximately 3:15 p.m., Plaintiff was working and observed large amounts of ore or and coke in the switches, the six-foot (the space between the two tracks), and the rail gauges from the Edgar Thompson Port Perry Yard all the way down to the trestle, which made walking conditions hazardous to personnel. Plaintiff reported these dangerous conditions to his Supervisor, Jay Browne, via an Employee Safety Issue/Hazard Observation Form, but the problem was not resolved. In his Form, Plaintiff noted that he would report this issue to the Pennsylvania state legislature representative if the dangerous conditions continued to go unresolved, as nothing had been done to resolve the issue despite his six previous reports.

17.  Although Defendant Railroad's Safety and Health Operating Practices Committee had acknowledged Plaintiff's other previous Safety Observations via letters, Defendant Railroad did not send any such letter to any of the above-mentioned reports.

18.  On September 12, 2017 at 8:00 a.m., Plaintiff began his shift as Utility Man with Defendant Railroad.

19. By 3:15 p.m. that day, Plaintiff had completed his utility services, so he came into the Yardmaster office and asked his supervisor, Kayne Newcomer ("Mr. Newcomer"), "what was going on," to which Mr. Newcomer responded "nothing."

20. Plaintiff then walked out of the Yard Office and into the crew room, where he decided to update his rule book, just in case the 2B crew needed help doubling up their empties once they arrived or the 76 crew to arrive with cars from the USS Irvin works.

21. To update his rule book, Plaintiff needed to make copies of the rules, so he walked into the Yardmaster's office three or four times. Mr. Newcomer never acknowledged Plaintiff in any way, but rather just continued to look at his cell phone, even though yardmasters and supervisors typically will tell employees to leave if there is no work.

22. By 4:00 p.m., Plaintiff had finished updating his rule book, so he again asked Mr. Newcomer "what was up," to which Mr. Newcomer responded that to "go ahead and punch out."

23. Because Plaintiff was still dressed in all of his gear and had to turn his monitor and other equipment in, he thought that he would be done working at 4:10 p.m. and thus noted his clock-out time as such on his time slip.

24. Plaintiff then walked into the Yardmaster office, set his time slip on the clock, and then Mr. Newcomer accused Plaintiff of stealing time. In a half-joking manner, Plaintiff responded by getting $10.00 out of his wallet and said that he did not want the overtime or money. Mr. Newcomer again accused Plaintiff of stealing time, so Plaintiff punched the timecard at 4:04 p.m., tossed the time slip on his desk, and walked out.

25. On September 12, 2017, Mr. Newcomer filed an incident report regarding the occurrence, making false accusations that he had seen Plaintiff sitting in the crew room since 3:00 p.m. that day, without any reason to be there.

26. Later, on September 12, 2017, the Plaintiff was notified via co-workers that he was out-of-service due to the report. This was confirmed the next day when Mr. Kearns called the company.

27. Around this time, Defendant Railroad also gave a formal notice of this investigation to Brad Elias ("Mr. Elias"), the SMART Transportation Division General Chairman of Defendant Railroad, who served as Plaintiff's representative at the hearing for this incident.

28. On September 16, 2017, Plaintiff received a letter from the Defendant Railroad, where Joshua Horrell ("Mr. Horrell"), the Transportation Supervisor of Defendant Railroad, charged Plaintiff with violating Defendant Railroad's General Rule 1.2 (Rule B), which requires employees to "be of good moral character," and prohibits employees from acting in an "insubordinate, disloyal, dishonest, immoral, quarrelsome" or "uncivil and discourteous" manner.

29. On September 20, 2017, Defendant Railroad held a hearing on the formal investigation of the September 12, 2017 incident, which was conducted by Hearing Officer Joseph Monfredi ("Mr. Monfredi") and attended by Mr. Horrell, Mr. Elias, and Plaintiff.

30. On October 2, 2017, Mr. Monfredi reviewed the investigation evidence and found that Plaintiff violated General Rule 1.2.

31. That same day, the Superintendent of Transportation, Patrick McGee, reviewed the findings of Mr. Monfredi regarding the investigation, found Plaintiff violated General Rule 1.2, and dismissed Plaintiff from Defendant Railroad.

32. Although Mr. Horrell summoned Plaintiff on September 26, 2017 for another investigation hearing to be held on October 4, 2017 about his rule book not being up-to-date, it was later cancelled on October 2, 2017 due to his dismissal.

33. Prior to the incident in question, Plaintiff had never been disciplined or injured by Defendant Railroad in any of his positions, including brakeman, conductor, and engineer.

34. On October 4, 2017, Plaintiff filed his FRSA Complaint with OSHA's Whistleblower Office, and Defendant Railroad was notified of its FRSA investigation.

35. On November 9, 2017, Mr. Elias met with J.M. Hudson, the General Superintendent, to discuss an appeal of the discipline based on the investigation on behalf of Plaintiff.

36. On December 8, 2017, Mr. J.M. Hudson granted the appeal related to the dismissal of Kearns, reducing the dismissal to a 90-day suspension and the assessment of 60 demerits. Plaintiff's return-to-work date was set as December 12, 2017. Plaintiff was only permitted to return to work if he accepted the unlawful discipline.

37. On February 2, 2018, Plaintiff resigned from the service of Defendant Railroad via letter.

## **FRSA CAUSE OF ACTION**

38. The Plaintiff adopts by reference and realleges each and every allegation set forth in the preceding paragraphs of this Complaint with the same force and effect as if set forth under this cause of action.

39. The Plaintiff engaged in protected activity under the Federal Rail Safety Act ("FRSA"), when he reported that he would notify his Pennsylvania legislative representative of the unresolved dangerous walking conditions on August 23, 2017.

40. The Defendant Railroad had knowledge of all the protected activities referenced above.

41. The Defendant Railroad took adverse or unfavorable actions against the Plaintiff in whole or in part due to his protected activities when Defendant Railroad dismissed Plaintiff on October 2, 2017. In so doing, the Defendant Railroad acted with reckless disregard for the law and with complete indifference to Plaintiff's rights under the FRSA.

42. On October 4, 2017, Plaintiff filed a FRSA Complaint with the Region III OSHA Whistleblower Office in Philadelphia, Pennsylvania, (Exhibit 1), that was within 180 days from the date the Plaintiff first became aware of the Defendant Railroad's intent to take unfavorable personnel action against him, namely, the September 16, 2017 notice of the investigation hearing.

43. The Region III Whistleblower Office commenced its investigation, and the Plaintiff fully cooperated with OSHA's investigation. However, OSHA did not issue a final decision within 210 days after filing of the FRSA Complaint. The delay was not due to any bad faith on the part of the Plaintiff.

44. Pursuant to Section (d)(3) of the FRSA, the Plaintiff has a statutory right to bring an original action in a United States district court for a jury trial regarding the Defendant Railroad's violations of the FRSA. 49 U.S.C. Section 20109(d)(3).

45. Pursuant to FRSA 49 U.S.C. 20109(d)(3), the Plaintiff is now bringing the original action at law and equity for de novo review by the United States District Court of the Western District of Pennsylvania, which Court has jurisdiction over this FRSA action without regard to the amount in controversy.

WHEREFORE, in order to encourage employees to freely report all injuries without fear of any retaliation, thereby ensuring the Federal Rail Administration has the necessary information to develop and administer an effective rail safety regulatory program that promotes safety in every area of our nation's railroad operations, the Plaintiff demands a Judgment under the FRSA for all

relief necessary to make him whole, including but not limited to expungement of all references to disciplinary action related to the incident of September 12, 2017, lost benefits with interest, lost wages with interest, compensatory damages for economic losses and emotional distress, the statutory maximum of punitive damages, and special damages for all litigation costs, including expert witness fees and attorney fees.

Date:   December 4, 2018             By: */s/ D. Aaron Rihn*
                                                                D. Aaron Rihn, Esquire
                                                                PA Bar ID No.: 85752
                                                                ROBERT PEIRCE & ASSOCIATES, P.C.
                                                                707 Grant Street
                                                                Suite 2500
                                                                Pittsburgh, PA 15219-1918
                                                                Tel: 412-281-7229
                                                                Fax: 412-281-4229
                                                                Email: arihn@peircelaw.com
                                                                *Attorney for Plaintiff*